Good morning, Your Honor. May it please the Court, Margaret O'Shea at the Attorney General's Office on behalf of the appellants. It is uncontroverted that the Virginia Department of Corrections has held inmates in long-term administrative segregation, what the plaintiffs refer to as solitary confinement. It is equally established that the Department of Corrections has established and implemented a nationally acclaimed program for the express purpose of helping successfully transition these inmates back into the general population. When the program was started in 2011, there were 511 inmates in long-term segregation in Virginia. By the time this complaint was filed, that number had fallen to 37. Virginia prison officials reasonably relied on precedent from this court, both in putting inmates in segregation in the first instance and then establishing the step-down program to help move them out. They are entitled to qualified immunity as to the constitutional claims, and the district court erred in denying their motion to dismiss. There are two overarching principles of qualified immunity through which this court should make sure to view the facts of this case. One is that qualified immunity is more than a defense to litigation. It is an immunity from suit, an entitlement to avoid the burdens of litigation. The second is that an inmate examined for qualified immunity must be scrutinized at the appropriate level of factual detail and not couched in overarching concepts of generalities and concepts of law. In other words, the determinative question is whether a reasonable official could have believed that their conduct was lawful in light of clearly established law and the information the defendants possessed. It protects all but the plainly incompetent or those who knowingly violate the law. Looking at the facts as alleged in this particular complaint, a reasonable corrections official could have believed that the conditions of confinement at Red Island State Prison and the procedures offered through the step-down program were constitutionally sufficient. So would that be true even after Porter v. Clark? As to the Eighth Amendment claim, perhaps, Judge Thacker. The defendants take the position here that Porter decided after the filing of this complaint is not determinative on the qualified immunity analysis. And as a panel of this court recognized that in the Latsen opinion, Porter changed the state of the law in the circuit by recognizing for the first time a basic human need for meaningful social interaction and positive environmental stimulation. So if Porter was the law, I understand your argument that it was obviously after the fact, but if Porter were the law at the time of this alleged violation, does the state concede that the allegations are sufficient to establish Eighth Amendment conditions of confinement violation? Well, so the inquiry, no, in short answer and long answer, the inquiry is not whether they've plausibly alleged an Eighth Amendment claim. It's whether a reasonable corrections officer looking at these allegations could have thought that the conduct conformed to the Constitution. So even now after Porter, the state's argument is that a reasonable officer wouldn't view these allegations as a violation, even after Porter? Yes, not necessarily. And the reason for that is because the conditions at Porter and the death row by virtue of their sentence and their sentence alone, they had no way to transition out at all. And when you look at the various privileges and opportunities that are afforded under the step down program, it expands the conditions of the confinement. It makes them less draconian than those that this court addressed in Porter. In addition to that, the inmates in Porter only have one hour of out of cell recreation per week. At the time this complaint was filed, all inmates held at level S, all of them, regardless of pathway, security level, so on and so forth, had at least two. I understand the court doesn't want to do a side-by-side comparison of the conditions necessarily, but twice as much out of cell time. When you combine that with the other opportunities in the step down program for group programming, for therapeutic programming, for work opportunities, it suffices to make the conditions at Red Onion State Prison less restrictive than those that existed at Sussex One State Prison and Death Row and were at issue in Porter. That said, the term of law here should be up until the time of the filing of the complaint. The issuance of Porter... Ms. O'Shea, in terms of the Eighth Amendment, it doesn't prohibit cruel and unusual prison conditions, but rather the question that we should ask is whether the confinement inflicts harm objectively sufficiently serious to deprive a prisoner of minimal civilized necessities. They have clearly pled that harm in this case, as opposed to some of the other cases just talking about conditions, here it's the result and the harm inflicted. Why did that get them by the immunity question? I understand, Your Honor. So the harm that they have alleged here, the deprivation of the meaningful social interactions, the ability to interact with other people, had not been recognized by this court up until the Porter decision. Case after case after case in this court had held that just not being allowed to be around other people, even if it resulted in negative mental effects, was not sufficiently serious to constitute an Eighth Amendment violation. As recently as 2012, in the Williams v. Branker decision, a panel of this court upheld the granting of a motion for judgment on the pleading, saying that the negative effects of restrictions in solitary confinement on an inmate's mental health are not enough to constitute the extreme deprivations required to make out of conditions of confinement claim. That case is notable because it came down in 2012 contemporaneously with the issuance of the step-down program by these defendants. A reasonable official looking at established law could have believed that the conduct here was lawful, at least up until the time of the Porter decision, which was issued after the filing of the complaint. Qualified immunity is an immunity from suit, and it should be judged as of the filing of the suit at the very latest. So for that reason, the court erred in denying the Eighth Amendment qualified immunity. Turning to the due process allegation, when you look to the various procedures and multiple layers of review that are afforded by this step-down program, a reasonable official looking at this policy would have, could have, believed that it afforded inmates a meaningful pathway out of segregation. When you consider the information that was publicly available to these corrections officials, 511 inmates transitioned all the way down to 37. And then when you look to the policy and the multiple reviews that are made available through not only the informal 30-day reviews, but the quarterly reviews by the dual treatment team, the biannual reviews by a team external to the prison, the yearly ICA reviews, the 90 formal due process reviews, those multiple lay reviews, some of which also apply for immunity, some of which the ICA hearings require advance notice and an opportunity to be heard, a reasonable official looking at this policy could have believed that it satisfied the dictates of due process as spelled out by Wilkinson and as later interpreted by this court in Incuma and subsequent decisions. Well, Ms. O'Shea, I'll give you that that policy looks really good on paper. The question that we should ask as to whether or not there's been practice, was this policy followed? And more than just checking a box and walking by a jail cell, I mean, that can't possibly count as meaningful review. I understand the court's question. Here, the plaintiffs have not really challenged any specific individual procedural review that they say failed to follow the policy. They're saying the policy as a whole, because this action is brought against the policymakers. It wasn't brought against the individuals who go through the housing unit and apply the policy. The policymakers looking at the policy would not have had any reason to think that the procedures spelled out here don't provide a meaningful pathway out of segregation and nor have the plaintiffs sufficiently alleged those facts in their complaint. It's their burden to allege sufficient facts to show that the process was not meaningful and that the policymakers should have known that the policy was not meaningful. But when you consider the knowledge of the policymakers, the enormous number of inmates that transition through the step-down program, and not just that, but other external sources as well, this court called this step-down program a sophisticated, well-conceived program to better behavior and improve the safety and operation of the prison. The Department of Justice acknowledged specifically Virginia and what a great job Virginia was doing in the implementation of this program. The Vera Institute of Justice did the same. Source after source, not just the courts, but sources external to the courts, told the Department of Corrections that what they were doing was laudable. Then for them to later be denied the benefit of qualified immunity for this nationally acclaimed program that had been subject to all of these accolades would be unconscionable. Any reasonable official looking at the step-down program and the conditions of confinement that it imposed would have believed that the conduct posed in putting inmates in segregation and then establishing this program to allow them to transition out was lawful, that it complied with the dictates of the Eighth Amendment, that it complied with the dictates of the Fourteenth Amendment. Corrections officials are not supposed to be able to predict the behavior of institutional scholars. They are lay individuals, and a lay individual knowing what these officials knew would not have believed that their conduct transgressed the federal constitution. Unless the court ... Counsel, you said anybody looking at the program, like Judge Floyd said, it looks pretty good. The question is, first of all, we don't make determinations of facts. You understand, in the Fourth Circuit, we say that's sort of jurisdictional. Qualified immunity of facts to be determined, we don't do that here. Correct? The court is entitled to look at the facts as known to the officials. Does the court engage in specific fact-finding, resolving credibility issues? It's not just as known or should be known, and if those facts are in dispute, we don't make the determination to resolve those disputed facts. Correct? Well, the qualified immunity analysis doesn't require the resolution of disputed facts. It's a reasonableness, objective ... Sometimes it does. I'm saying when it does, we don't make that decision at this point, right? We don't resolve the disputed facts. The court doesn't resolve disputed facts. What the court does is look to the factual allegations of the complaint. Look to facts that are subject to judicial notice. If there is a conflict between facts and a policy that's appended to the complaint and made a part of that complaint under Federal Rule 10C, the attachment prevails over the bare, unsubstantiated allegations in the complaint. That's not resolving a disputed issue of facts. That is looking to the actual policy that ... They allege that you come with the procedure that's already pre-filled out, formed. It's the same thing. You talk about past conduct, you're really not assessing what their actual present or contemporary behavior is. You don't use ... There's no peniological justification for it. You don't use compass as you do for general population. All of these things that are being empirical to determine it, you don't even use them. That's what they're alleging, that you have something and you put it together and put a ribbon on it. It sounds good, but you got to open the box up first and see what's in it. There are allegations on. It is nothing. It is really rote. You stay in and you put the process together. You put the process together, so you have noticed if you're not following it, you would know that if you have predetermined, already filled out forms and everybody gets the stamp, denied, that's what they're alleging. You said we had ignored those facts and just said because you have a policy attached to it, we have to then say, oh, there's a policy there, so they must be wrong about their facts. I'm alleging that they have not sufficiently alleged that these defendants were or should have been aware of any deficiencies in the program. They have not brought this against the unit managers or the counselors. Wait a minute. Because we don't satisfy, but wouldn't you know if you already predetermined form before you have a hearing and review? Wouldn't you know that? I'm asking a question. No, no, no. Ask a question. If you are official and you know before the hearing, you already have a pre-filled out form saying denied, wouldn't you know that? If you are the person conducting the hearing, not if you're the person who wrote the policy, they're different. But there are more. You've got a resolving management process committee. These are not just policies. These are people. It's a systemic claim. It's not just someone who wrote the policies. And when I wrote the policy, I don't know anything about it. But these are the functionaries who carried out their alleged. You can't divorce the case solely from, well, somebody in the Ivy Tower wrote this. And unless you can say they keep back that this policy, they wouldn't know. No, they're saying systematically this is nothing but a farce. You come up there. You don't even look at what they've really done. You look at the historical behavior and say, deny. It's already filled out form. I'm not saying it's true, but that's what they're alleged. And you make it this that this is a medically sealed and not to be permeated at all by the allegations. We just because you have a policy. How could that be? It's a question. But before the court isn't necessarily whether they have plausibly alleged a due process allegation. The question is whether a reasonable corrections official looking at established law could have believed that the policy survived constitutional muster. It's a reasonableness, an objective standard. Not just to the policy, but 511 inmates to 37. That is information that they knew and were entitled to consider when evaluating whether the step down program satisfied the dictates of the due process clause. Ms. O'Shea, this case is before us on a motion to dismiss. And it's certainly the pleadings have a bearing on the question. For example, the complaint alleges that during the relevant period, each defendant participated in creating, administering or implementing the step down program or and or failed to properly diagnose and treat the plaintiff suffering from harm. I mean, what? Why is that sufficiently played to get them by a motion to dismiss? I see that my time is expiring. So because your honor, the question is not just whether they plausibly allege the due process violation. It's whether a reasonable official looking at those allegations could have thought that the program was OK. It's separate and the two should not be completed, conflated and missing from this complaint. In addition, are allegations that would support the reasonable inference that the policymaker should have known of the deficiencies in the program, it is their burden to put those facts in the complaint to support their ultimate conclusion. And they did not do that. It is not unprecedented for this court to uphold a finding of qualified immunity in the context of a motion to dismiss on a rule 12B6. In fact, the the parole board decision that your honor wrote back in 2014, did exactly that, upheld the finding of qualified immunity as to a due process claim raised at the rule 12B6 motion. But it's not just it's not just the policymakers, it's the boots on the ground. And they are alleging that the boots on the ground weren't doing what they were supposed to do. And as a result, they've been harmed. So if they can prove that maybe at the summary judgment stage, you get relief on qualified immunity. But if they can prove what they say, I don't see how you can get by prevail on qualified immunity. Because the boots on the ground are not defendants in this case and respondeat superior does not apply an action under section 1983. I would like to reserve the remainder of my time unless there are further questions. Well, that goes back to my question that it looks good on paper. But they're alleging in practice is not working. This paper is important here because of the objective reasonableness standard of qualified immunity. Thank you. Thank you. If there are no further questions, I'll reserve. Thank you. Yes, sir. Yes. Yes. Counsel. So I'm going to hawk Hawker. Thank you, Judge Gregory. Good morning, Your Honors. May it please the court. Vishal Agra Harker for the plaintiffs. I will be my muted. No, you can hear me. OK, great. So I will be spending the first half of our time addressing the Eighth Amendment claim today. And then my co-counsel, Andre Papa Beach, you will be addressing the due process claim. Your Honors, plaintiffs were held in a program that they allege was designed to warehouse people in conditions that defendants knew put them at risk of severe and often permanent mental and physical harms. And that had that served no legitimate logical purpose of taking those allegations is true and not the alternate set of facts that defendants put into their briefing. No reasonable official could have believed that it was constitutional under the Eighth Amendment to implement a program to keep people in conditions that they knew to impose such harms. And this is especially true in light of this circuit's precedent in cases like CityNet and Thompson and others that qualified immunity does not protect government officials when they violate the law with actual knowledge of a risk to constitutional or statutory rights. And that's precedent that defendants didn't address in their briefing and didn't address here today. I would like to first address why the law is relevant to our allegations was clearly established long before Porter. I'll then touch on the Williams versus Branker decision, which defendants put into their reply and that we haven't had an opportunity really to address fully. And I want to finally just touch on our alternate theory of relief under the Eighth Amendment for wanton infliction of pain without a penological purpose on which the district court also very clearly denied qualified immunity. So, onto the first point plaintiffs acknowledge that long term segregation on its own, without a showing of serious harm was not clearly established as unconstitutional, at least until Porter, a case that granted summary judgment to plaintiffs on their eighth amendment claim about the conditions on Virginia's death row, without any finding in that case that the plaintiffs had in fact been harmed. That's different from what we elect. And in fact, it was clearly established long before Porter, that the types of conditions in this case, either alone or in combination can give rise to an Eighth Amendment violation but only if they actually pose a serious risk of mental or physical harm to prisoners. Thus, in Williams versus Griffin in 1991 this court said, quote, that a totality of prison conditions can be combined to show an Eighth Amendment violation is a proposition established in many cases. And there the court found that overcrowding focuses on the harm rather than the condition of confinement. Well, are the clearly established law, well in advance of Porter said that conditions of confinement, including the types of conditions of confinement in this case, would violate the Eighth Amendment, where they combine or in by themselves, in fact, pose a serious risk of harm. And in this case, we're alleging. So then wouldn't it be that some defendants in the same confinement conditions, there wouldn't would not be a violation if they weren't harmed, while others in the same confinement condition, it would be a violation because they suffer harm. That's right, that's right. Well, that can't be. That's not very clear then is it. I don't think. Well, depends on the, on the inmates susceptibility. Well, it depends on whether they've in fact all the cases have said that is strickler sweet all the cases of defendant site going back to the 70s said that isolation by itself and we agree by itself doesn't render segregation unconstitutional absent actual harm. So, whether it's isolation whether it's limited restrictions on exercise but there are virtually infinite set of different kinds of conditions that you might be subjected to. And unless you are actually harmed by them, and not just harm but face a severe harm. Whether it's mental or physical, you can't state an eighth amendment claim because you can't satisfy the objective from now, that principle has been clearly established for decades. But that principle in light of what the district court found that we've allegedly alleged about defendants. In this case, specifically, their awareness of the harmful effects of the conditions in a program that they designed to warehouse people indefinitely through the kinds of sham procedures that my co counsel will be addressing on the due process side. And for no good reason for no penological purpose, other than, as we alleged to fill prison beds and unused prison beds in in these two prisons. Given that knowledge that we allege that we allege in a nearly 100 page complaint about, about the history of the development of the set down program and how it was, it came after several repeated failed experiments by the DLC to set up earlier programs that other state agencies had found were developed after the, after the DLC disregarded medical recommendations. These are very different types of allegations from the typical solitary confinement case where plaintiffs often don't possibly allege harm to themselves, or, or, or defendants awareness of those harms, and the fact that individual planets and other solitary cases could not make out a showing of serious harm to themselves. At summary judgment, almost every case is not a reason to this miss this case on qualified immunity grounds at this stage, of course defendants will have another opportunity to assert qualified immunity at summary judgment. Now, opposing counsel did mention, and I think maybe this gets to your question. Your position in that that Porter and Latsin did not change the landscape at all in terms of this case and the allegations in this case, not in terms of this case I think Porter would put prison officials on notice that long term solitary conditions on their own. So after Porter, it might be easier for a typical solitary confinement plaintiff to say, who's alleging that their conditions, cause them harm to hold it that a warden of a jail responsible for the conditions and their equivalent of disciplinary long term disciplinary set, but even before Porter, it was established that if a person was placing conditions that would in fact causing serious harms, that would be unconstitutional, and given our. Well, you're saying that Porter changed nothing in terms of the allegations in this case. That's right, given the clearly established inquiry has to be undertaken in light of the specific allegations in the case. And, and here. And so I think your honors question maybe goes to the specificity of the inquiry, whether we're looking at it at too broad a level of generality, and the qualified immunity inquiry is fundamentally concerned with notice, and whether, whether the case law and specificity is needed to, to the extent that it is required to put reasonable officials on notice that their conduct is prohibited. I guess I'm also, I'm actually backing up a little bit trying to get a handle on what you allege the violation to be in this case, versus what Porter found the eighth amendment violation to be. Our allegations are about the design and implementation of a program to warehouse people indefinitely in conditions known to cause harm by essentially policymaking officials who are developing a policy to create a program that they, that would keep people indefinitely in conditions that they knew. These were high level policymaking officials who had the awareness of the scientific consensus that had emerged in the lead up to 2012 when the program was implemented, and had the had that awareness based on their own past failed attempts at establishing solitary confinement in their precursor programs that. So it was more about the design of the program, the program itself, rather than the typical cases. Porter in the fourth circuit long term solitary confinement did not violate the eighth amendment. Long term solitary confinement per se did not. No. And, but our allegations about are essentially about putting people in conditions that you knew would harm them. Designing a program to warehouse them in conditions based on clearly established law saying that you cannot put people in conditions that would in fact pose a serious risk of harm. That was sufficient, and it's especially true in light of this principle in throughout several cases in this circuits precedent, saying that qualified me doesn't protect government officials when wrongful intent is central to the underlying claim as it as it is. Is that is this the car is that an objective or subjective question. Thank you, Your Honor, it does go to the objective from because it goes to whether their awareness goes to whether it is fair to say that they had noticed that that the objective prong was met. So, yes, it goes to subjective from this case right at this stage is about the objective from, but, but their awareness of the harms cause goes to whether they were sufficiently on notice under qualified immunity standards. And so, looking at, I see that my time is up. May I complete the thought, Your Honor. Yeah, yeah, you may complete the thought and I have a question for you before you sit down. Yeah. So, given the case law in city net and Thompson and Dean, that when you're violating the law with actual intent with wrongful intent, then qualified immunity is inappropriate that applies at this stage to our claim just as strongly if not more strongly and certainly more strongly than the typical Solitary confining case that this court has seen. I want to go back to just factors. Good question, because it may make it clear. This is more of a I want you to clarify for me. Now, you said before Porter, it was it was it was understood that mere separation. Was did not give rise to a cause of action. Eighth Amendment. Correct. Right. I just being separation. Separation is that aspect of say, say, and that's what the very name of it is, is to be segregated to be separated. So, mere separation before that was not enough, they would not be on notice for separation, along being the effect of segregation. Not merely segregation, but many other types of prison conditions because the key is whether they in fact cause a serious harm. But yes. All right. So what then in your case is more than separation that somebody would be on notice of pre Porter. Explain the divide somewhere in terms of your case, how notwithstanding that separation was not a cause of action before that. How would they have known that before that case that what was doing here was more than separation or exposure to dangers. I think one way to answer this question is to look at the case, even from the 1970s that actually laid out that principle suite said isolation by itself doesn't render segregation unconstitutional absent other illegitimate deprivations, but even in that case, the court remanded to the district court to determine whether just one aspect of that. May have been harmful to a prisoner of health, and if so would amount to an age. You froze on us. I apologize, Your Honor, I said, even in suite, the court, in fact, remind the remanded to the district court to determine whether just one aspect of segregation prolonged restrictions on exercise would in fact be harmful to a prisoner of health, health, and if so would amount to an eight minute violation. Strickler suite all stood for that same principle and given our allegations that, in this case, these high level policymaking officials knew that the specific conditions that they were putting people in were in fact harmful. And what was that there was more than separation. Go ahead. Follow it. In sweet. It was in your case. Oh, in my case. Well, so the court found that we have alleged a variety of serious harms. So the defendants haven't actually challenged that we have stayed a violation only that the law was not established, but specifically the harms include, for example, post traumatic stress disorder schizoaffective disorder major depressive disorder. There are there are many that are listed for the various plaintiffs. And so those are the kinds of actual injuries. So it's not you can't look to just the specific condition, whether it's inadequate ventilation, lack of exercise, you say, well, did those cause injuries are allegations at this point that they knew that they did. And yet they did it anyway. And that also goes to our second theory. Really, you can't knowingly harm people for no good reason. And how did they know that they did? Was it because of the scholarly research? It's based on the the consensus that had developed about, yes, in the lead up to the development of this program. It's based on their own repeated failed attempts at earlier setting up earlier programs where another state agency had found that they consulted with and then disregarded recommendations of other officials. It's based on their own their own experience with people in long term segregation. And what is the difference between the conditions of confinement in Porter in the conditions of confinement alleged here that make it different from Porter and clearly established as a violation before Porter? Your Honor, so by my reading, they are highly, highly analogous. Most of the different. This is the first time the defendants have raised this point that even Porter wouldn't put people on notice that these conditions weren't weren't constitutional. Well, if they're highly, highly analogous, the conditions in Porter and the conditions in this case. How then was the violation clearly established prior to Porter? Because of our allegations about their knowledge of the specific conditions that that existed in the in the step down program, in fact, satisfied the objective. Well, in the in this case, you have sensory deprivation, which was not considered back in the 70s. I mean, clearly, there's literature and science that sensory deprivation causes extreme harm to folks. That's absolutely right. And that consensus developed over time, but was was clear by 2012. But what was established just in the law was that if you know you're putting someone in conditions that would seriously harm them, then that's a constitutional violation under either theory of relief. And that's what at this stage is clear. So your allegation is that they knew that beyond separation, they were doing harm. That's your allegation. Essentially, that's that's exactly right, Judge Gregory. That's what the district court possibly found in this case that he didn't find in each of the red onion cases that defendants cite on page 32. The brief that was a distinction in those red onion case. He said, well, they haven't possibly alleged harm. Yes, these were pro se plaintiffs. Right. And how is it that they knew that they were causing harm? I'm sorry, I just I really want to understand. I really do want to understand your argument. No, thank you. That's accurate. And I want to be as clear as I can. I guess two things. One, defendants, again, have not actually challenged in their briefing that we have stated a violation. If only. And we flushed out on page 22 and 23 of our brief. They've only challenged whether the law was fully established. Our allegations are that they knew based on the consensus. And of course, this is the eighth amendment. It looks at the evolving standards of decency based on the consensus that had emerged in the lead up to 2012. I think one of the amicus briefs by psychological officials also kind of lays this out as well as their own failed experiments with the step down program or with precursor programs to step down program where they consulted mental health professionals and then disregard their recommendations. And then their own experiences with people in this program of their various programs of long term solitary confinement and seeing that themselves. Well, let me ask you this. Would you agree that this analysis is a two step analysis? And it appears to me that the state of Virginia is trying to only trying to prevail on step one without going to step two. And in this case, they need you need you have you have played both steps. Is that correct? We have fled both steps. The court found that we have we have on the eighth amendment claim that the court, the district court found that we have sufficiently pleaded an allegation both as to the objective prong and the subjective prong. And then they found that it was the law was clearly established. Defendants with respect to the eighth amendment claim only challenged that second step of the clearly established inquiry, meaning that the law wasn't clearly established. If that answers your question, your honor. They haven't challenged that there was that they were doing harm. Well, harm was correct. They haven't challenged in their briefing. They have not challenged that the court's finding that with respect, for example, they haven't said that. I think Ms. O'Shea mentioned that. Well, you have to show the harm with respect to each individual defendant. They didn't make any of those challenges in their briefing or challenge that we have stated adequately stated a violation. They only said that, well, the law wasn't clearly established because quarter came out in twenty nineteen. And so that's that's what we focused our briefing on. All right. Unless there are other questions, I'll allow my co-counsel to. Good morning, your honors. Andre Popovich for the plaintiffs addressing the due process claim. Your honors, the complaint alleges that the defendants designed and administer step down as a system of periodic reviews that has kept plaintiffs in solitary confinement for two, four, six, even eight years or more. But step down doesn't give plaintiffs notice of the grounds for keeping them in solitary confinement or an opportunity to rebut those grounds. What step down does give them is a system of protection reviews that keeps them in indefinite solitary confinement through unfettered discretion over decisions governing their eligibility to step down. Preordained rubber stamp reviews and having past conduct dictate permanent conditions of solitary confinement for some plaintiffs had a clearly established liberty interest in avoiding the conditions of their confinement under Wilkinson and Nkuma. And the reviews they received violated their clearly established due process rights under Wilkinson and Nkuma and Hewitt. First, I'd like to address why the defendants are wrong that documents outside the complaint prevail over plaintiff's allegations. Next, why it was clearly established the plaintiffs had a liberty interest. And finally, why it was clearly established that step down reviews don't provide due process. Defendants spend much of their reply brief and arguments today asking the court to disregard plaintiff's allegations about VDOC policies and practices in favor of their own interpretation of cherry pick provisions in those policies and other irrelevant or extraneous information. The complaints allegations, though, aren't just based on the text of VDOC policies. They're also based on the deposition testimony of VDOC officials and other litigations, as well as extensive interviews with prisoners as to how those policies are interpreted and applied in practice. Sometimes practice tracks the text. Sometimes it fleshes out what's vague and not apparent. So VDOC policies can't be construed in the defendant's favor to defeat the complaint's allegations. It's well established that this court declines to take judicial notice of a party's interpretation of the contents of documents attached to the complaint when the parties clearly and reasonably disagree about the meaning to be ascribed to them. And judicially noticed facts are construed in the light most favorable to the plaintiff along with the well-pleaded allegations of the complaint. Your Honors, none of the defendant's arguments to VDOC policies directly contradict the allegations in the complaint actually hold up under scrutiny. To give one example, the defendants say the complaint's allegations about minimum periods in the IAM pathway are contradicted because they are unsupported by VDOC policies. But the minimum periods come directly from the VDOC policies in the record, which say that IAM prisoners must spend six months continuously in each of phases 0, 1, and 2, and must spend a minimum of 12 months in IAM closed phase 1 before progressing to IAM closed phase 2. That's a JA 161, 186, 188, and 207. And in deposition testimony in another litigation, VDOC's Rule 30b-6 representative confirmed that IAM prisoners can't be considered for advancement before these required minimum periods. As another example, the defendants have argued that VDOC policies contradict the allegation that the only way a level S prisoner may earn a lower security level is by completing the step-down program. But they don't cite any policies plainly contradicting our allegations, which are not only based on the text of the policies but also deposition testimony on VDOC practice. In short, the defendant's attempts to ignore the complaints' allegations must fail. Your Honor, the plaintiffs also had a clearly established liberty interest in avoiding solitary confinement. The facts alleged in this case are materially indistinguishable from those in Wilkinson and Nkuma. As to the severity of plaintiffs' confinement conditions, the complaint alleges the same conditions of extreme isolation and severe restrictions as in Wilkinson. This court in Nkuma found that similar conditions were in fact worse than in Wilkinson given the highly intrusive strip searches that prisoners go through every time they leave their cells. As to the indefiniteness of those conditions, in Wilkinson there was no indication how long prisoners could be held in the Supermax facility once assigned there. Step-down also provides no indication how long prisoners will stay in solitary confinement. There are only minimum periods, no maximums, and the plaintiffs have been there for over six years on average, an indicator of the indefiniteness of their confinement. For prisoners on the IM pathway, VDOC policies create permanent conditions of solitary confinement. As to the collateral consequences, as in Wilkinson, plaintiffs in step-down are denied parole they would otherwise be eligible for. And as the plaintiffs allege and as this court also found in Smith, being in step-down can reduce or deny the opportunity to earn good time credit towards sentence reduction. Nkuma also found that collateral consequences weren't necessary to give rise to liberty interest given the other similarities to Wilkinson. Defendants haven't even disputed that plaintiffs had a clearly established liberty interest at the very latest by this court's 2020 decision in Smith v. Collins. That case is also dispositive here since the complaint alleges conduct that continues today. But Smith didn't change the law, it simply applied the law clearly established by Wilkinson and Nkuma to the step-down program. Finally, Your Honor, step-down reviews violated plaintiffs' clearly established due process rights. Wilkinson and Nkuma recognized that core due process protections to protect the liberty interests of prisoners in administrative segregation are notice of the grounds for the decision and an opportunity to rebut those grounds. Does Wilkinson hold that notice, opportunity, rebuttal, and appeal procedures are required or only that they were sufficient in that case to satisfy due process? Your Honor, Wilkinson held that they were sufficient in that case to satisfy due process, but it also recognized that those protections were among the most important procedural mechanisms to avoid erroneous deprivations of liberty and essential to guard against arbitrary decision-making, to give prisoners a basis for objecting before the next decision-maker, and to serve as a guide for future behavior. And Nkuma added that the prison's interest in order and security does not eclipse a prisoner's well-established right to receive notice of the grounds for his ongoing confinement and to present his rebuttal to those grounds. Your Honor, the plaintiffs don't receive those minimal protections here. First, the BMC decides every month if prisoners meet the requirements of the step-down program and can move up to higher privilege levels within Level S, such as from SMO to SM1. These decisions are final, prisoners can't appeal them, and prisoners don't get access to them. Isn't there a periodic review? So the ICA decides every 90 days whether prisoners can move down from Level S to Level 6, but these security-level decisions depend entirely on the BMC's privilege-level decisions. And at the ICA's so-called formal due process hearings, which are held at the prisoners' cell door in last-only moments, prisoners are handed... The counsel for the state said that since 2012, the population in solitary confinement had decreased from more than 500 to, I think she said 37. What does that do to your argument about whether or not the procedures in place are actually meaningful or not? Well, Your Honor, again, it's well-established that judicially noticed facts like that are construed in the light most favorable to the plaintiff. The complaint also points out that VDOC statistics are misleading, as they omit prisoners in the IMSL6 closed pod who face materially the same conditions, that's at JA85 and 101 to 102. So in the light most favorable to the plaintiff, those statistics are misleading? They don't say anything about the efficacy of the procedures in place at the step-down program? Yes, Your Honor. What you're saying is that in that number, 500 might include people who have stepped down, but their conditions are no different, really, than the others. Is that what you're saying? Thank you. Yes, Your Honor. And also, before this case was filed, the named plaintiffs had been in level six for an average of six years. Since this case was filed in May of 2019, several of our named plaintiffs were suddenly moved to general population or transferred out of the state. This court noted in Smith its skepticism about arguments that Smith's solitary confinement under the step-down program wasn't indefinite when the court noted he was only able to achieve progress in step-down after he filed the lawsuit, after which he was inexplicably jumped three steps from SMO to SL6. Your Honors, at the ICA's so-called formal due process hearings, prisoners are provided pre-prepared ICA decisions with conclusory rationales, such as needs longer period of stable adjustment. These serve primarily to document whether the BMC has allowed them to complete the step-down program. As in Nkuma, that's not a factual basis. Plaintiffs only receive a perfunctory explanation that rubber-stamps their status, listing the same justifications in rote repetition, and that practice encourages arbitrary decision-making. And as in Nkuma, there's no right to contest the factual basis for detention, since the ICA has already made its decision, and the lack of reasons means the prisoner has no basis to object. And although the DTT every three months and the ERT every six months also do informal reviews, there's no suggestion in defendant's briefs that they provide any reasons. Indeed, the defendants haven't disputed that step-down, in fact, fails to give any notice of the grounds for prisoners' ongoing confinement or an opportunity for rebuttal. The entire system of reviews is also not multi-layered because plaintiff's ability to step-down depends entirely on the BMC decisions that are final and not reviewable. Your Honor, I was also going to explain why step-down also denies the right to non-protectual reviews. Since Hewitt, prison officials have been on notice that administrative segregation may not be used as a pretext for indefinite confinement. The complaint alleges that step-down, by design and as implemented, gives plaintiffs pretextual reviews that keep them in indefinite solitary confinement. In view of the time, though, unless you have any further questions, for these reasons, Your Honors, we ask that you affirm the decision below. Thank you so much, counsel. Appreciate your argument. Ms. O'Shea, you have some time reserved. Thank you, Your Honor. Returning to the Eighth Amendment question, it bears emphasizing that qualified immunity is a reasonable person's standard. It is not subjective that the point of qualified immunity is to allow officials to conform their conduct to then-existing law. The law must so clearly and unambiguously prohibit the conduct that every reasonable official would have known that their conduct, that what they were doing, violated the right asserted. The focus is not on alleged resultant harms or other subjective elements. It's on the objective reasonableness of the conduct as alleged in the complaint. As Judge Thacker noted, and Judge Gregory, you as well, the conduct alleged here is not so different from what was upheld in multiple prior opinions from this court, that every reasonable corrections official should have known that what they were doing violated the law. This is true even in Eighth Amendment cases that have an objective and a subjective element. The focus is not on subjective allegations. It's on the objectivity. What exactly are they alleged to have done? Were they clearly on notice that they can't do that based on the law of this circuit? And the answer in the Eighth Amendment context is no. Ms. O'Shea, let me point you to something I think is very critical. Judge Thacker zoned in on it a couple of times, and the focus of that is in terms of knowing that harm was done. For example, and you don't have to look at this, but if you look at J-105, it's alleged that the VDOT, their policy requires ongoing solitary confinement of prisoners who exhibit symptoms of apathy, liturgy, attention deficits, poor grooming, and failure to maintain an orderly cell, and failure to complete challenges in the H-series book. Well, it seems like the fact that what it is, the harm is being caused is the same thing to make you not qualified to get out of prison. And those things are cited as reasons to continue. So isn't that absolutely, it's a vicious cycle. It's like the results of our holding you in these conditions are also the things that make you not eligible to get out. Isn't that the ultimate vicious circle? You follow what I'm saying? And these are the things that are consistent with liturgy, attention deficit, failure to do your own personal grooming, to take care, that's what a person would likely do in terms of Judge Floyd was talking about sensory deposition, deprivation, contact with a human being. That's what happens to you. But you, not only does it not account for that and address that harm, but it says that's why you have to stay here because you're doing what people normally do when they have this kind of harm. Isn't that interesting that you, how do you address that? Well, so I understand that that's our allegation, Your Honor, and that may very well be. Are we dealing with allegations at this point? Well, those are allegations that bear on the subjective element of the Eighth Amendment analysis. This court had held as recently as 2012 that negative effects of restrictions on mental health are not enough to constitute an Eighth Amendment violation and the defendants were entitled to reasonably rely on that on pronouncement of the law when deciding to retain individuals in segregated confinement. That case says that if you know you're creating that harm, that wasn't enough. Or just saying that having that harm was not enough. Here, they're alleging you knew because it was in your process to look for it, find it, and then find them not qualified to get out. I'm not sure that I see that exact same conclusion from the allegations in the complaint, Your Honor. Well, all right. The focus is on the objective reasonableness of the conduct, not the subjective knowledge of these specific defendants. The Ninth Circuit very recently teased this out in an opinion talking about an Eighth Amendment medical indifference claim and they said you don't look to the allegations that bear on the subjective knowledge of the defendants. You look to the objective reasonableness of the defendants' conduct to ensure that the law is being applied fairly and uniformly across the boards. It's the objective conduct that's at issue, not the subjective knowledge of the specific defendants. It's not the subjective knowledge. It's the objective knowledge of the defendants here who saw this, recorded it, and made it a reason for them not being qualified to get out. They've documented it and used the documentation to disqualify them from being stepped down. What are you talking about? It's subjective. It's not just them. They have observed these harms and then found them, let's call it insult to injury. And I see, Your Honor, where that might bear potentially on the due process allegation. I don't see it in the context of Eighth Amendment conditions. Okay, all right. I see that my time has expired unless there are... No, I took up almost all of your rebuttals, so I'm going to allow you to have three minutes to do what you would have done otherwise. I had not disturbed you. I appreciate it, Your Honor. I will try to be succinct. On the due process, I think it's important to retain the lens that we're looking at post-segregation review. It's not the initial decision to put someone in segregation in the first instance, which hasn't been challenged in this case. The procedures that attend, the decision to put them in segregation clearly comply with the Wilkinson dictates. When you look to the after-the-fact, ongoing post-segregation reviews, if you take the language in Hewitt, the footnote that says that, well, it's dicta in my estimation, although I understand it's been brought and incorporated into subsequent opinions from this court. They just say there has to be some sort of periodic review. And in Hewitt, if you read the entire footnote, the very last sentence of that footnote says, well, he was afforded one hearing 30 days after he went into segregation, so clearly it wasn't a pretext. That's the holding of Hewitt. When you look to Wilkinson, which was addressing putting the inmates in segregation in the first instance, but also looked at the entire procedure, there was one annual review that was upheld as being sufficient for purposes of due process. The Department of Corrections has gone far, way and above anything that was required in Wilkinson or Incuma or the other decisions that have been issued by this court. The policy, when you look at the policy, an objectively reasonable corrections official would not believe that it did not afford meaningful progression out of segregation. 511 inmates to 37. That fact speaks for itself. These defendants are entitled to qualified immunity. The district court should have granted the motion to dismiss the claims against them in their individual capacities and allow the official capacity claims to proceed as they are presently doing in the district court. Thank you. Thank you. Thank you, counsel. Thank you all for your arguments. We can't come down and reach you, but nonetheless, we very much appreciate your helping us on this case, and we wish that you would be safe  Thank you, counsel. Thank you, Judge. Thank you, Your Honor.
judges: Roger L. Gregory, Stephanie D. Thacker, Henry F. Floyd